The first day of the sitting of the week for the three of us, several panels here this week. We are fortunate to have this group join us. We have four cases this afternoon. We'll take two, and I expect we'll take a break after two, and then return. The first argument of the afternoon is, I'm not sure, Uvansi v. Bobby Lumpkin, 23-20435. Mr. Schaffer. May it please the court, I'm Randy Schaffer from Houston. I represent Fenichi Uvukansi, convicted of capital murder, sentenced to life in prison without parole. There are three issues we need to discuss. Number one, what is the standard of review for a false testimony claim on federal habeas? Number two, did the state court violate clearly established Supreme Court precedent by requiring the defendant to prove by preponderance of the evidence that the false testimony affected the verdict? And number three, would every reasonable jurist agree that the false testimony in this case was absolutely material? I will hit Wooten and Brecht head-on as we discuss these matters. To put this in context, Oscar Gerasano is the sole eyewitness to a triple murder. He has a 10-kilo federal cocaine case pending at the time he comes forward to provide information. He testifies he has not been promised anything in exchange for his cooperation and testimony, that he's here to help the victim's families and not himself. And the prosecutor argues during closing argument that the jury should believe him because he has no motive to lie. His lawyer, Brent Wasserstein, testified at trial that he would notify the federal prosecutor of Gerasano's cooperation so she could file a 5k1.1 motion and request leniency. The jury did not know that the state prosecutor, Gretchen Flader, had promised to write a letter to the federal judge in support of Gerasano. Uwe Kanzi is convicted. After the time expires to file a motion for new trial, so this issue could have been perhaps raised on appeal had it been discovered, Flader then writes the letter to Judge Rainey, who's going to sentence Gerasano, and says that Gerasano's testimony alone convinced the jury of Uwe Kanzi's guilt. And in a case where Gerasano was looking at ten to life, a guideline range of 235 to 293 months, and deportation, he got three years probation and no deportation. This case has been before ten state court judges and two federal judges, and not one of them has had a problem with what Gretchen Flader did. I do, and that's why we're here today. Well, I mean, they found it was false, but also found that the jury was told that to some degree. Not as much as you wanted them told, but to some degree. So what is your best Supreme Court case on something similar to this? Well, I mean, Bagley, Bagley, the jury was not, the state court found that Gerasano lied and denied he'd been promised anything in exchange for his testimony, and they made a number of specific findings about different things he lied about. But the essence of it all was that he lied in denying that the state would do anything to help him. And Flader's fingerprints are on nothing as far as the jury was concerned. We got findings on false testimony across the board, but here's where we got hung up. The state court finding on materiality, and this is where the rubber meets the road on this one. The state court found that we did not prove by preponderance of the evidence that the false testimony affected the verdict, as the jury could have believed Gerasano's identification of Uwe Conzi, even had the jury known that Gerasano had lied about the benefits he would receive. In other words, instead of considering credibility as an entire unit, the individual, is he credible or not, you cut it in half. And if the jury knew he was lying about his motive to testify, they could still find he was telling the truth about the identification. If that holds, they've wiped out about 65 years of Supreme Court case law. If you can cut credibility in half like that, the state... Well, but his motive, when you're yourself a criminal, you may not really want to testify about another criminal. So his motive to testify could be different here, because he identified this person from, as I understand it, a bunch of people all standing together. He picked this one. He picked your client. How would he do that? How would he pick that person based upon his desire and all of that? First, there was no lineup. It was a photo spread. Yeah, but it was across the board. Well, I mean, you kind of have to understand how these deals worked. His lawyer contacts the detective and says, hey, I've got a guy who is willing to help out and make an identification. His problem is he's got a 10 kilo cocaine case pending in federal court. I know you're not going to want to hear this, but the way the rubber meets the road in these kind of deals, the defense lawyer meets with the detective. The defense lawyer figures out who the suspect is and where he's going to be in the photo spread. He talks to his client. The client goes in. Now, what evidence is there that that's true, that he was kind of given a fake, you're going to see numbers 1 through 10 pick for what I'm answering your question. There's no evidence of that at the trial. So that's kind of important. How could he do it? I'm telling you how he could do it. Well, I mean, you can always pick somebody fake. But what I'm saying is why? I mean, what indication is there that he did do that as opposed to picking the guy he saw out in the parking lot? Well, the jury would have to make that decision for themselves based on their determination of his credibility. Here's what the Court of Criminal Appeals did. They denied relief without written order. And this is where I want to talk about Wooten. Presumptively, the CCA adopted the trial court's findings and conclusions under the look-through doctrine of Wilson v. Sellers. The director contends under Wooten, the Court of Criminal Appeals could have chosen not to adopt the trial court's findings. That's not the way it works. If the trial court I'm sorry, if the Court of Criminal Appeals does not adopt the trial court's findings, it issues a written order and says we reject findings whatever. And I did send y'all a letter brief on Friday with three of my cases where they had done exactly that. There's two other cases more recently. One of the things that struck me about the Court of Criminal Appeals practice is there may not be a consistent practice. Ways to phrase their one word denial of habeas relief. Is there any kind of rule of the Court of Criminal Appeals, formal rule that says every time they're accepting the findings and conclusions, here's what they say. If they're just accepting the denial of relief, here's what they say. There's nothing logical. There's no written rule. It's just a practice. It seems to me whatever you have maybe you could do a survey of all the opinions, but I don't think that would tell us much either. So it does seem to me that one way to read what the Court of Criminal Appeals did in their one word ruling, one sentence ruling, more than one word, is just to say that all we know about that is that it accepted that no relief was permissible or deserving in this case. So then we're sort of stuck with our federal rules of practice, which is whether you look through to the lower court decision, which is not in the usual form here. It's more of a magistrate judge's opinion that is being dealt with by the actual judges. Or you decide that there's no ruling at all insofar as expressing their reasoning. What is the better way in your view for us to go? That it's an unreasoned decision without a look-through? Or that if you do look through, another question is whether the findings and conclusions are plausible and should be upheld? Well, I think we have to follow Wilson v. Sellers until the Supreme Court says otherwise. We have to look through. Wilson is the law, but whether it applies here is our question. So what I'm telling you is there is no written rule to answer your question that the Court of Criminal Appeals has on these. It's a matter of practice. But the practice is, either you're denied without written order, which is an adoption of the trial court's findings and conclusions, or they deny with a written order and then specifically reject certain findings or conclusions. Let me address the Brecht issue. So under Bagley, when the defendant proves the prosecution knowingly presented or failed to correct false testimony, the prosecution must prove beyond a reasonable doubt the false testimony did not affect the verdict. The director contends that Brecht applies to a false testimony claim raised on habeas under Brown and Wooten. Brecht is a post-arrest silence case. Brown is a shackling case, both in the Supreme Court. Wooten is an involuntary guilty plea case. These cases involve ordinary trial errors that occur during the presentation of a case. The Supreme Court has never applied Brecht to a false testimony claim in a habeas proceeding, nor did this Court in Kirkpatrick, which was decided after Brecht. More importantly, and this is where I think we need to focus, the Supreme Court did not apply Brecht to a Brady claim in 1895 in Kiles. They said a due process claim has its own materiality analysis. It's not subject to an additional harmless error analysis under Brecht. So let's look at suppression of evidence, Brady, versus false testimony, Napoo and Bagley. The prosecution makes affirmative use of the false evidence in a case like Uveconzi instead of just hiding favorable evidence. If you say that suppression of evidence is 9.5 on a scale of 10, you would have to say false testimony is a 10. You do that, you win the prize. To require the defendant to prove harm under Brecht on a misconduct and encourage them to repeat it knowing that if it did not get discovered in time to raise it on direct appeal and the defendant was relegated to habeas, he would have a more onerous standard of review. So you would encourage prosecutorial misconduct by not applying Brecht to a false testimony claim, which is why the Supreme Court did not do it in Brecht. Here, the state court required us to prove harm by preponderance. There is no Supreme Court case requiring any federal habeas petitioner to do that for a constitutional violation under O'Neill v. McInnish, 1995. Just like the tie goes to the runner in baseball, the tie goes to the habeas petitioner. So he does not have to prove harm by preponderance of the evidence. So the state court finding in this case was contrary to Supreme Court precedent, and this court must review materiality de novo. Could the false testimony have affected the verdict of the jury? And here's where I get serious now, and that's on the issue of materiality. This case is Naipoo Redux. Naipoo, 1959, 65 years later, we're still dealing with the same issue. In Naipoo, the jury knew that the public defender had promised to do what he could to help reduce the cooperating witnesses' sentence, but the jury did not know that the prosecutor had also made that promise. And consistent with what you had asked earlier, the Supreme Court said that even though the jury knew part of what benefit the witness might receive, they didn't know the whole picture. And an undisclosed source of bias can be material. And in this case, it was. This court decided Lacaze v. Warden in 2011 on the exact same basis. Also, don't you think you have proved it by a preponderance of the evidence? I mean, if preponderance of the evidence is the right method, do you think you can't meet that? I think I proved it beyond a reasonable doubt. But you know, the state court put me to the burden, and that's in violation of the law. Well, but if you've met the burden, then why is that the big thing we need to think about? Because I want it all. You know, I want the law to be favorable to other clients that have to deal with this in the future. Well, we have to decide this case. And so if you think you prevail regardless on that, then maybe you should turn to the key, I think, for you is what precisely was material that was not given to the jury in his trial? So the state court found that the false testimony was not material because impeaching Gerasino's motive did not impeach his identification. That disregards the legal maximum falsus in uno, falsus in omnibus. You can argue if a witness lies about one thing, you can't believe him about anything. If the jury in this case had known that Gerasino lied regarding the benefit he expected to receive and that Flater had sought to deceive them by keeping it from them, that would have affected whether the jury believed his identification and called in to question the integrity of the entire prosecution. You're talking about splitting it in two. It seems to me what the state district court did is found there was other testimony in which this information was gotten in front of the jury. The finding is Flater impeached Gerasino through the cross-examination of Wasserstein, who testified he did, in fact, tell Gerasino that testifying would probably help him. So what you're saying is you wanted the stronger evidence of some sort of commitment or not. But here this information that Gerasino knew or was told if he testified it would probably help him was in front of the jury. Isn't that significant as we weigh the materiality of the error? I'm saying under NAPU, the fact that the jury was told that his lawyer was going to try and help him, which is what lawyers do in every case supposedly. You try and help your client by giving favorable information to the court. That doesn't tell them anything about what the state's going to do. And that's the importance of this case. I'll leave you with a final point, and then I'll come back. I'll borrow a minute of my time. I believe the materiality of false testimony should be measured by the length the prosecution went to keep it from the jury at trial. Here, Flader did not elicit on direct examination of Gerasino that she was going to write the letter. She successfully objected when the defense lawyer tried to cross-examine him about it, and then she argued that he testified to help the victim's families rather than himself, and then she writes a letter to the federal judge after the time expires and the case is on appeal, that his testimony alone got Uvakazi convicted. Truly, if that is not enough to show that the false testimony was material, what else could you possibly need? I'll throw one question out that I would invite my colleague . . . May it please the Court. Lori Brodbeck for the Attorney General's Office of Texas. The appellant was properly denied relief for three key reasons here. First, he's mistaken that Chapman applies. Brecht made it very clear that Chapman can never apply to a habeas proceeding, and that is the respondent's arguments regarding this. To shirk his burden of showing materiality, he's relying on nonexistent Supreme Court precedent. Second, he disregards the CCA's long understanding that it is free to adopt or not adopt the lower court's findings. Here, it chose not to adopt it, and also the CCA had original jurisdiction. Therefore, the presumption in Wilson v. Sellers does not apply. But, whether or not it adopted it, it had to determine that there wasn't a proper habeas, okay? So, if there's nothing that the Court of Criminal Appeals could have relied on to say no habeas, we still could throw it out, right? We could still find habeas here. Habeas relief, Your Honor? Yes. I mean, what I'm saying is this notion that, okay, they didn't say anything. If that's enough for the state to always win, then the state Supreme Court, well, Court of Criminal Appeals will always say nothing. So, my point is, even if it says nothing, if there still isn't anything that supports the finding, whether it's A, B, or C, if none of those support the finding, then that still would be something we could grant habeas on, right? I'm just saying hypothetically, not this case. Well, hypothetically, in this case, actually not hypothetically, the lower court made findings of fact, and appellant had a chance to object to those findings, and he made pretty much the same arguments he's making now. So, if, hypothetically, the appellant were correct, the CCA should be able to disregard those findings, and it often does. It will deny without written order. It will deny without written order on the findings, or it will deny without written order on the findings and its independent review, as it's recently starting to do, most likely because of Wilson v. Sellers, and that is language almost pulled specifically from the dissent in Wilson v. Sellers, when a court can make its independent review. In this case, perhaps the trial court had the wrong materiality standard listed. The CCA receives plenty of habeas matters and direct appeal matters. It can't possibly write out an opinion every single time in this matter. Okay, but you're not answering what I'm saying. I'm sorry, Your Honor. What I'm saying is, even if, so let's say that there were three things that could have been considered, A, B, C, and the state trial court said A, and A is just clearly wrong, but B and C are right, well, then we could say, okay, well, the Court of Criminal Appeals, they looked at B and C. But what if they're all wrong? Are we still required to affirm or basically not grant habeas because of the Court of Criminal Appeals not saying anything? That's what I'm saying. I'm saying in a hypothetical case. Hypothetically, I believe that Evans v. Davis would help with that. Looking at the record in front of the CCA and making a determination of what the CCA could have decided based on the record. In this case, this record was highly developed. There were several hearings that were held to make factual findings. And again, the CCA is the ultimate legal concluder. It's the ultimate fact finder. This isn't like the Georgia habeas structure, like Wilson v. Sellers was reviewing. This is a situation where it's not a final conclusion by the trial court and then appealed to the CCA. The trial court acts like a magistrate, makes recommendations, and then appellant objected, and the CCA made its final conclusion. There might be a situation where the CCA needs to explain itself. And as it has explained in ex parte read, it will do so. But it won't always do so, especially with the number of habeas matters that it has to review. Okay, you still haven't answered my question. Well, no, Your Honor. That shows that you know what my answer is. The answer is, yes, we can grant habeas even if the CCA doesn't say why they denied it. Yes, Your Honor. Okay. If there is, if it's proven to be an unreasonable conclusion. Right. If there's no reasonable. Oh, yes, if there's no reasonable conclusion. Okay, so the question here is, to me, the question is, is there a reasonable basis for denying the habeas? Oh, yes. All right. Sorry, Your Honor. I will get to that. If this, if Your Honor is willing to accept that Chapman certainly doesn't apply in habeas matters. A habeas petitioner always bears his burden of showing that he is entitled to habeas relief. Even if the appellant pushes through AEDPA and gets a de novo review as the appellant wants now, he still has to prove his materiality in this case. And the CCA had plenty of options in front of it. Counsel, before you move on, it seems to me the more, the structure of our analysis is, certainly is true in what you and Judge Haynes were talking about. If there's nothing on which the Court of Criminal Appeals could have relied to deny relief, then that's error that we need to deal with. But I heard you say earlier that because of the role that the original jurisdictions in the Court of Criminal Appeals, district court is it, whatever the state trial court is, makes the findings and conclusions, that this is not a situation that falls under where if it's an unreasoned appellate court decision, you look through to the lower court findings and conclusions. But the only other kind of general category is if it's unreasoned, then what are plausible reasons that would uphold the denial of relief? And it does seem to me we are ignoring, if we don't look at the state trial court's decisions and findings and conclusions, we're ignoring the benefit of that, which the Court of Criminal Appeals itself uses. I'm just wondering, this does seem to be something of a merger of the two approaches, the look-through and the coming up with what are the likely reasons or reasonable reasons that the appellate court have relied on. Do you have anything to go on that says which way, whether we should to some extent not treat this as a look-through case? I mean, isn't that your position? We should not look upon this as a look-through case? Well, as this court recently decided in Wooten, it's a rebuttable presumption. So the fact that the CCA received objections, it could have relied on some of the findings, but rather than explain which findings, it doesn't. Well, that applies regardless. I mean, that makes it a look-through case, it seems to me, that even if you have a lower court decision, you don't have to say that the higher court relied on it. And that's where, you mentioned it before, you can look at the briefing and otherwise look at what was presented to the higher court that challenged the findings that might still allow us to say it was proper to deny relief. I mean, I think that's what Wooten says. Well, I understand, Your Honor. I'm just going by what this court recently decided in Wooten, that if there is any sort of unreasonableness in the trial court findings, the appellant can't point to that as he is now to show that the ultimate conclusion was unreasonable. That is the director's position. And certainly by any factual findings that support the reasonableness of the CCA's ultimate denial, then, yes, the court can rely on it. Why don't you address that now? What are reasonable findings that would say this was immaterial? Certainly, Your Honor. The jury heard from either Gerasano, the eyewitness, or his defense counsel, Mr. Wasserstein, 10 pieces of impeachment facts, all related specifically to his federal drug case. First, that he was charged in federal court for possessing over 10 kilograms of cocaine. Second, he was facing 10 years to life. Third, he was facing deportation as he was not a U.S. citizen. Fourth, they knew that he pleaded guilty and admitted that offense. Fifth, they knew he didn't immediately come forward and rather waited nine days. Sixth, the jury knew he didn't go directly to the police. Rather, he went to Mr. Wasserstein, his defense counsel, and then didn't even meet the police at the station but rather at Wasserstein's office. Seventh, they knew he had his sentencing continuously reset for over two years just so he could testify at appellant's trial. It wouldn't take much hand-holding at that point. But to go further, at number eight, they knew he was on bond, and he had the conditions of his bond altered, including his GPS monitoring. Nine, they knew that he knew that if he testified, he could get a reduced sentence, and I think Wasserstein even testified that he most likely would get a reduced sentence. And ten— I didn't know that. What was the specific testimony that let the jury know that if he testified, it would benefit him? So Mr. Wasserstein specifically informed the jury that he would then inform the federal prosecutor about Gerasano's cooperation with the state. Is that the one piece of testimony you would rely on for that piece? Yes. Any false evidence that Gerasano may have testified to regarding not knowing where his consideration was coming from, Wasserstein cured it. He cleared it up by explaining that the prosecutor, the federal prosecutor, would file a 5K11 motion. But your opponent said people are always trying to help their clients, so the fact that a lawyer is going to go help their own client is quite different in a criminal case from the prosecutor going to help the defendant. And there was no saying of that. No, Your Honor, there was. That that letter was going to happen from Fadler. No, the letter wasn't, no. Okay. So the notion that, oh, well, I'm going to go talk to Fadler and say, hey, why don't you give him a little bit because he helped out, is quite different from she's already said, yeah, we're going to help, and we're going to send it to the court and say, yes, yes, yes, help it out. I guess the distinction here from this case and in Pooh is that Flater had no control over Gerasano getting a reduced sentence. It was the federal prosecutor who would then file a 5K11 motion. Ms. Flater even indicated she wasn't entirely sure how a reduced sentence could happen. She was operating under the belief that he was going to get prison and was surprised that he got probation. But also why this argument that Flater's letter to the federal court was somehow going to be the straw that broke the camel's back in this case, even after all ten of those pieces of impeachment evidence, it's unreasonable based on the state court record, because three different attorneys who were present at the trial testified at the habeas proceeding, at the habeas hearing. That was Defense Counsel King, Flater, and Mr. Wasserstein, and they all put very little worth in the letter despite appellant's belief that it was somehow very important and necessary for due process. Ms. King was facing a Strickland claim because she knew about the letter, she knew Wasserstein knew about the letter, and he was on the stand so she could have elicited that testimony, but she didn't because she said the meat of Gerasano's agreement and his consideration was already in front of the jury. There was nothing left to squeeze from that particular fruit. And Wasserstein clarified on habeas that Gerasano wasn't getting probation just because of his agreement to testify for the state. In appellant's case, he was also cooperating with the federal drug case, so this was just one factor in many that eventually led to his getting probation. Counsel, one of the considerations here, and that does seem strong evidence of this, is you have these arguments and some of this got in front of the jury, but what definitely got in front of the jury is without this witness, no one could have identified the defendant. Correct? And so it's extraordinarily important that anything that might have impeached the veracity of that witness legitimately, reasonably, get in front of the jury. And it does seem to me there's a difference at least between saying the defense counsel is going to try to help him out after testifying and that the prosecution has agreed to help him out if he testifies. Isn't that a distinction that would weigh on a jury? Yes, Your Honor, and Wasserstein specifically talked about his agreement with the federal prosecutor. So again, it boils down to this letter. I talked about it at the habeas hearing. I talked about it in front of the jury. In front of the jury, he talked about that he was going to tell the federal prosecutor who would then file a 5K11 motion to reduce Jarrett. You've gone beyond what he told the jury, didn't you? No, Your Honor. That's in the Record on Appeal, page 2357, where Wasserstein testified to the jury about this specific agreement. That's why this is different from NAPU. NAPU, it was, Your Honor, Wasserstein basically said, oh, I'm going to give it a shot. That wasn't the case. This was an agreement, and Wasserstein even explained what that agreement was. But also, Defense Counsel King did a fine job of impeaching Mr. Gerasano, not just as to this particular drug case, but also to his direct testimony concerning the appellant and identifying him. First, she pulled from him that he should be wearing glasses. He didn't wear glasses at trial, and he couldn't remember if he wore them on the night of the murders. Second, he testified or had earlier stated that he hid behind a white charger, and she pulled out that this was inconsistent because when the police arrived at the crime scene, there was no white charger to be seen. And third, she presented an expert witness on eyewitness testimony, and he had opined that Gerasano was not reliable, and he gave his reasons. So with those three specific impeachment evidence and the ten I just listed, at some point. What ten or did you list nine of them? Sorry, the tenth was Mr. Wasserstein specifically stating that he had an agreement with the federal prosecutor. I apologize, Your Honor. I think you got interrupted at nine. Yes. I thought you wrapped it up. I'm sorry. You all were losing interest, but I think that's a perfect explanation, that the jury at some point was going to lose interest as well, that you were starting to experience diminishing returns, and this final little letter was not going to push the needle one way or the other. The jury knew everything they needed to know about Gerasano and make a credibility determination, and they just believed him. Coupled with some circumstantial evidence, including appellant lying about his alibi, the alibi coming forward, Mr. Rhodes saying, I'm sorry, I wasn't there, and I didn't pull appellant back in. So he was caught in a lie in that sense. So if the court has no further questions, I just conclude with that Chapman's shifted burden of proof should not apply, even in Giglio-Napoo claims. There is no Supreme Court precedent that establishes that, and the CCA shouldn't have to read the tea leaves and look through footnotes and connect them to dicta in order to reasonably apply Supreme Court precedent. Second, Wilson v. Sellers' presumption is rebutted here, and then third, that the district court's denial be affirmed. Counsel, you were talking a bit ago about the Court of Criminal Appeals perhaps changing its practice. Has it adopted any new rule on how it's going to deal with its short-form upholding of the denial of relief, or short-form denial of relief? No, Your Honor, it has not. You talk about some recent language, but that's just some recent orders that you've seen that uses that language. In my limited experience, I returned to this job in 2018 after being away about ten years, and I had not seen an independent review added to it either adopted the findings or didn't. So I learned through the grapevine that it was because of Wilson v. Sellers, most likely. Most likely it was. All right. Thank you, Counsel. Okay. No further questions? Thank you. May it please the Court. The one thing I did not see in the State's briefing or in my colleague's argument was, what is the overriding principle the State is asking this court to protect? Is it the right of state court prosecutors to put on false testimony and keep the conviction? More importantly, for federal habeas purposes, here's the question I would ask you to ponder on federal habeas. What interest does the State of Texas have in preserving the finality of a conviction obtained through the knowing use of false testimony? My colleague said that the Court of Criminal Appeals chose not to adopt the trial court's findings. I don't know where she gets that from. If I understood her correctly, they didn't reject any finding of the trial court. Well, I took that statement to mean at least you're rephrasing it, you're restating it, is they chose not to state that they were adopting it. We don't know if they adopted them or not. Well, and all I can tell you from practice from the cases I cited in the letter brief, and there's tons more, is that when they reject findings of fact or conclusions of law, they issue a written order saying so. That's been the practice probably for the 51 years I've been doing this. So, you know, when they reject it, they tell you what. Even if they don't tell you why, they tell you what they reject. They didn't do that here. Let's focus on, drill down on the materiality. Here's what the jury did not know. The jury knew that Wasserstein was going to try and help Gerasino with the federal prosecutor get assistance on reducing his sentence. The jury knew that. What the jury didn't know is the state had agreed to help that happen. And as we all know, a recommendation from the prosecutor carries a lot more weight than a recommendation from the defense lawyer at sentencing in any context in any court. How does Wasserstein's testimony cure Gerasino telling the jury, no one has promised me anything for my testimony, and Flater arguing he's here to help the victim's families, not himself. We haven't promised him anything. Why didn't Flater want the jury to know that she had promised to write the letter that turned out to be his get-out-of-jail-free card? Why didn't she want the jury to know that? I'll tell you why. Because if she had disclosed that, a competent defense lawyer could have stood up and told the jurors, you can't believe anything Gerasino said. The state has purchased his testimony, not with dollars, but with the more valuable currency of his freedom by helping him get a reduced sentence. I mean, let's not kid ourselves. Ten kilos of cocaine and a Colombian guy transporting them, that's cartel dope. He's transporting $200,000 worth of cartel dope, and he walked out of there with three years probation and avoided deportation because he identified a guy in a triple murder. Why didn't the state want the jury to know the truth about that? This prosecutor committed a crime at this trial. She engaged in unethical conduct in violation of the state bar rules at this trial, and they want you to let her get away with that by keeping a conviction. Nobody pursued that, did they? I'm sorry? Nobody pursued that. You did? You filed a grievance? You bet. Okay. And what happened? I'm told it was confidential. Do you want me to tell you? Well, if it's confidential, I guess. I was told it was confidential. Okay. But here's the bottom line. If you write an opinion that they want you to write, I would have said in the old days it would be hung on the bulletin board of every district attorney's office and U.S. attorney's office in the Southern District or in the Fifth Circuit as a blueprint for how the prosecution can make a deal with a witness, keep that deal from the jury, obtain a conviction, and keep it. Now, these days it will just be circulated by an e-mail, I guess. You will give a blueprint to prosecutors for the next half century on how to suppress evidence, put on false testimony, and keep a conviction. And as you sit here over the course of your career. . . Well, I'm hopeful that prosecutors in general don't want to violate ethics. You will. Well, I'm hopeful that also defense attorneys don't want to. I'm hopeful that attorneys as a whole follow ethics. And I have these cases every day that raise the same issue. I'll leave you with this thought. If as you sit here during the course of your career, whether it's another five years, ten years, thirty years, whatever, and I hope it's long and rewarding and satisfying, and you see these cases continue to come in to you, you will not have to ask yourself, why does this keep happening 65 years after NAPU? Because you will know the answer. Thank you. Thank you both for your explanations of this case. Take it under advisement. We'll call the next case of the afternoon.